**UNITED STATES of America,**
**Appellee,**

v.

**Deborah WOODARD, Defendant,**
**Appellant.**

**No. 01–2229.**

United States Court of Appeals,
First Circuit.

Heard March 7, 2002.
Decided May 31, 2002.

Timothy G. Watkins, with whom Owen S. Walker, Federal Public Defender, was on brief for appellant.

John A. Wortmann, Jr., Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, and George W. Vien, Assistant U.S. Attorney, were on brief for appellee.

Before LYNCH, Circuit Judge, CAMBPELL and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Defendant-appellant Deborah Woodard appeals from a criminal judgment entered against her on the ground that she was deprived of counsel in violation of the Sixth

Amendment to the United States Constitution. On the eve of trial, Woodard requested substitution of counsel. The court refused and told Woodard that she could either continue with her present counsel or represent herself; if she represented herself, her counsel would remain available to help her if she wished. Later, the court told Woodard she could bring in new counsel if she could do so in time for trial. Woodard decided to represent herself at a suppression hearing and at trial, and the court dismissed counsel before the jury was selected.

A jury convicted Woodard of one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). Although we are troubled by the district court's dismissal of Woodard's counsel, we hold that it did not rise to the level of reversible error. Accordingly, we affirm the judgment.

## I. *BACKGROUND*

On November 16, 1999, a criminal complaint issued charging Woodard with possessing cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Woodard was represented by a private attorney, Harold Hakala. On December 2, 1999, a federal grand jury in the District Court for the District of Massachusetts returned a one-count indictment charging Woodard with the aforementioned offense.

Over the next fourteen months, the district court held two scheduling and pretrial conferences that Woodard did not personally attend. Trials were scheduled for April 24, 2000, and for September 25, 2000, but both dates were continued when Woodard indicated she wished to change her plea. At least three change of plea hearings were scheduled, then continued.

At the second conference (styled as a "final" pretrial conference), on July 17, 2000, the district court set a trial date of September 25, 2000. The court set September 5 as the deadline by which Woodard should file a motion to suppress evidence. No such motion was filed. The trial did not take place on September 25, but instead was generally continued while a presentence investigation was conducted.

The next status conference was on January 3, 2001. Woodard was present at the hearing. The court announced that it was setting the case for trial on January 16, 2001. Hakala immediately made an oral motion to withdraw and communicated Woodard's request that the court appoint new counsel. He stated:

> Your Honor, Ms. Woodard has made it clear to me that she would like to have counsel appointed to represent her from here on out. I am private counsel. I think that it's a fair representation to say that the attorney-client relationship has been difficult for several months. It's been strained. I've tried to keep it together. I don't mean to suggest that it's Ms. Woodard's fault that it's fallen apart, but I think it's reached a point where it's irretrievable breakdown. I think that in good conscience I could no longer continue to represent Ms. Woodard.

The court sought clarification from Woodard:

> Ms. Woodard, again what passes between you and your attorney is private to you. And so by asking you questions myself, I'm not trying to get into what passes between you and your attorney. But this case is scheduled for trial. We've been ready—we've been getting this case ready for trial.
>
> Now, I've scheduled the case for trial a week from Tuesday. Now, it's very surprising to me that now I hear for the first time that you want another lawyer. You tell me why—but you don't have to

go into what passes between you—you tell me why you don't want this lawyer who's worked the case up to trial to represent you.

Woodard responded that "our relationship is strained and we're not having a good attorney-client relationship. It's not working out." The court asked what Woodard thought another lawyer would do for her that her attorney was not doing. Woodard replied that "[M]aybe I would just feel a little bit more comfortable with another relationship. It's just not working out for me." The court asked, "Is that it?" and Woodard answered affirmatively. The court denied the oral motion:

This seems to me to be a transparent effort at the eleventh hour to get a continuance. It's denied.

Now, he's your attorney, he's who you have selected as your attorney, and the case is going to trial a week from Tuesday on the 16th. Now, that's the motion, it's denied.

Hakala attempted to intercede:

Respectfully, I think Ms. Woodard, I'm just guessing, but I have a sense—I appreciate your viewpoint. I mean, it's well-founded. Obviously, she hasn't said anything specific. She has lost complete confidence in me. She's probably—she may be embarrassed to even say that in open court. But I'm not afraid to say it. She's expressed it to me many times. We can't even—there is—there are many times that counsel finds himself in a position with a strained relationship, if you will, between his client and himself. It's happened many times, it's okay, and I've gone forward that way. This is a case where I don't think that Ms. Woodard will be best served by having me as counsel at trial. She has no confidence. She has challenged everything I've done, frankly. And that's okay, but she's done

so with a view that I'm not doing what's right. And it's gone on for months. And so perhaps I've been remiss in not bringing it forward earlier to the Court's attention and let you know that there is a strained relationship, but I thought maybe we could proceed. It looked like it was going to be a plea. We had done some preliminary work on some other issues. They fell through.

The court responded:

Well, I ask her, I ask her what the problem is and she says she would feel more comfortable. That's not a ground for, at this time, changing lawyers.

Now, the fact is she may disagree with you. But I assume you're working with what you have in this case and I have no reason to impugn either your competence or your preparedness and, therefore, there's no reason in the interests of justice to continue this trial. I don't hear any. She elected you initially. We're going forward on the 16th.

On January 16, 2001, Hakala again reported to the district court that he felt he couldn't represent Woodard, stating that she was now refusing to speak with him. Hakala submitted a letter from Woodard addressed to the court:

The issue between Mr. Hakala and myself is: I would like to have a suppression hearing before I go to trial or plea. I have asked Mr. Hakala several times about obtaining a complete discovery package that would show the police report of the couple who made the alleged statements against me. The drug analysis and the disposition of their cases. Also my travel documents that would show when I was out of the country. Mr. Hakala feels that I would lose the motion based on a appeal that he lost. *Commonwealth v. Singer*, that is his thought based on his defeat. There are enough mitigating factors to warrant a

different situation in my case. On Jan. 3[th] when we came to court I wanted to filed a motion to suppress, he wanted me to plea guilty. Because we cannot agree, he asked to be removed from the case, I asked for new counsel.

We only had 5 minutes to talk down stairs because transportation was waiting. I called on Monday, but there was an emergency code in the prison and I could only talk for a few minutes. I try to call on Tues. & Wed. No answer. On Thur. I spoke to his secretary who informed me Mr. Hakala would be in court all day, "to call back Fri. at one clock" [sic]. I called Friday, she answered the phone and hung up, I called right back she hung up again. I called at two clock she answered and said that "Mr. Hakala left for the day" and said "he would see me in court Tuesday".

As I beg your honor for compassion due to the abrasive & disconcerting attitude of my counsel, whom has manifested his biasness toward me, even extending to deny me access to minimal verbal communications as before mentioned. The time that has been left is insufficient. Nothing in the least has been resolved. The Courts position Justice for all extendeds to the latlitude of discretion for counsel to the accussed. Justice in the broadest sense of the word, would be denied me, if an opportunity to secure competent legal advice isn't obtained. I have no faith in my counsel. I am therefore asking the U.S. Court to assist & allow me a new counsell, to pick up from this point and move forward to the conclusion of

(Punctuation and paragraph format added; errors in original.) The letter breaks off in mid-sentence and is signed by Woodard. Woodard also handed the court a second letter, from Hakala to her, which responded to her inquiry regarding a suppression motion six months earlier. The court treated Woodard's letter to the court as a Motion to Change Counsel, which it denied.

After reading the letter, the district court began questioning Woodard directly about evidence suppression issues. Woodard questioned the affidavit in support of a search warrant used to seize evidence in her case. Cautioning that it was not getting involved in plea bargaining, the district court asked the government if it might allow Woodard to tender a conditional plea. The court explained the mechanics of a conditional plea and urged Woodard to consult with counsel. The court then announced that if a plea agreement was not reached, the trial would proceed. It told Woodard that she had three choices:

> You can go ahead and have Mr. Hakala represent you, and as I say I think he's prepared to do it, and the trial will proceed. You can represent yourself. You have that right to represent yourself. And I will treat you with every courtesy. I can't cut you any slack, but you can certainly represent yourself. And we'll have Mr. Hakala stay right there and advise you if you want his advice, or you can cut yourself free of him and represent yourself. But trial there will be, or some other resolution. So have that in mind.

Hakala reported to the court that Woodard wanted to enter a conditional plea. He asked to withdraw, but stated that he "would be willing to stay in the courtroom in case any questions arise as to what my involvement was or whatever was represented to her." Woodard assented to this arrangement and the court allowed Hakala to withdraw, "for the moment," while Woodard embarked upon the plea colloquy *pro se*. Hakala remained in the courtroom during the plea colloquy; the court advised

Woodard that she could consult with him at any time.

In the plea colloquy, the court confirmed information about Woodard's background, including the fact that she had attended college. It also confirmed her understanding of the nature of the charges and the penalties she faced. The court then explained to Woodard that she could (1) conditionally plead guilty to the indictment with a mandatory minimum sentence of 120 months in prison, (2) plead guilty to an information charging a different offense and set of facts for a lower government recommendation, or (3) go to trial. During this colloquy the court and Woodard also discussed her right to "face her accusers" and its implications for a suppression hearing and trial.

Woodard asked about moving to suppress the evidence found in her home as the result of an executed search warrant. She voiced concern that if she went to trial, she would not be allowed the opportunity to challenge the search warrant used. The court decided that the jury should be selected first, and then the motion to suppress heard.

The court then conducted a colloquy with the defendant concerning her decision to represent herself:

THE COURT: Now, let me explain this to you. It's a big mistake to represent yourself. Let me tell you. You have a right to. And I'll let you represent yourself on the motion to suppress. But I'll let you represent yourself on the whole case. You have a constitutional right to represent yourself. But you don't know how to do this. You don't know how to pick a jury. You don't know, you don't know how to ask questions like a lawyer does. And while that's your constitutional right it's not going to help you to represent yourself.

How about having Mr. Hakala handle the trial and you do the motion to suppress?

WOODARD: Judge Young, I've asked for a change of counsel. I've asked you for a change of counsel twice. I've asked you for a change of counsel.

THE COURT: And I've denied it. Fine. That's how you want do it [sic].

WOODARD: I mean, that was one of the big issues with me was may I have a change of counsel. Because I wanted to attack the suppression, a long time ago I wanted to attack the suppression. So that's why, one of the disagreements Mr. Hakala and I had was about the search warrant.

THE COURT: The fact that I'm allowing you to do this does not for a moment suggest that I think that any of the counsel Mr. Hakala gave you—

WOODARD: I understand.

THE COURT:—is wrong. This whole thing may be—my mind is completely open—it may be · a waste of time. But, the reason I'm taking so much time is primarily because it's your liberty that's involved.

WOODARD: Uh-huh.

THE COURT: And I want to be clear, I want to be clear that you have had a fair shake at every step. I'm telling you, I think this business about change of counsel is all just to delay things.

WOODARD: No.

THE COURT: And if I give you—he's a · competent counsel, we'll let him handle the motion to suppress. Or you can handle it if he has no faith in it. But one way or another we're going to go forward.

The court then moved on to scheduling issues. Woodard explained that she would

not be ready to litigate the motion to suppress by the next day. The court responded that "[y]ou're going to have to have it ready."

The court moved on to jury selection. Woodard first asked that Hakala pick the jury, but later said she would pick her own jury. The court explained the mechanics of picking a jury to defendant and the jury venire arrived. After the venire filed into the courtroom, the following exchange occurred:

CLERK: Is Mr. Hakala excused?

THE COURT: He's excused.

COUNSEL: Thank you, your Honor.

THE COURT: Thank you, sir.

Woodard did not object to Hakala's dismissal.

After jury empanelment, the court gave the jurors preliminary instructions and dismissed them for the day. The court discussed the mechanics of the suppression hearing and its order that the government produce the witnesses defendant wanted. Woodard complained to the court that "I know that I won't be able to do anything and I won't have anybody to confer with about these witnesses ... I don't have anybody to talk to about, about the witnesses." The court replied that she did not have to worry about getting the witnesses because he had directed the government to produce them. Woodard asked if she could get her own lawyer. The court replied, "You get a lawyer between now and tomorrow and I'll recognize him."

Just before the hearing on Woodard's oral motion to suppress, the government provided the court with some discovery materials; it described them as "a rehash of a lot of the discovery that we provided to Ms. Woodard, but I just want to make sure she has it physically." On January 17, 2001, the court heard Woodard's oral

motion to suppress evidence and denied it immediately.

When the case was called for trial the following day, Woodard stated that she was not ready to go forward:

WOODARD: I'm not ready to go forward today, Judge Young. I don't feel I'm able to represent myself and I feel I need a lawyer.

THE COURT: You asked to represent yourself.

WOODARD: I don't feel I'm able to.

THE COURT: I told you that it was very unwise to represent yourself.

WOODARD: Yes. I don't feel I'm able to represent myself.

THE COURT: Beg pardon?

WOODARD: I don't feel I'm able to represent myself.

THE COURT: Well, you dismissed Mr. Hakala, your counsel. And I told you the choice was to represent yourself or have Mr. Hakala represent you. You dismissed him. I offered Mr. Hakala to sit there at counsel table, let you do it and have him advise you. You rejected that. Now we're going forward.

WOODARD: I don't have a lawyer and I cannot represent myself. And I did not reject him. I came again and tried to talk to him. He said he feels it was best that he did not represent me. He asked to leave and he left. But I cannot represent myself. I don't know the procedure. I don't know the—I can't represent myself. I can't.

THE COURT: Well, ma'am, I must tell you that I think that your conduct here is designed solely to frustrate this trial going forward. You had a competent lawyer—

WOODARD: No.

THE COURT:—who represented to the Court that he was prepared to go forward with your defense.

Now, you simply cannot rule the proceedings in this Court. I have bent over backwards. I have allowed you to have the hearing that you requested. I have told you we were not going to continue the trial. I have advised you how unwise it is to represent yourself. Now we are going forward.

Let me explain to you how we're going to proceed.

WOODARD: Judge Young, may I say one other thing. I have not used this as a stall method. I asked for that hearing in June. I can show you paperwork that documents I've asked for it in June. I have not tried to stall things. I have tried to work with Mr. Hakala. If you read the letter I asked him, I asked for this motion to suppress in June. I have done nothing to try to—I have tried to work with him. I've done everything I can to work with him. I am not trying to stall this trial in the least. I am in a position where I don't want to be in that position. Why would I try to stall it? I've tried to get this to trial. I asked him to go to trial many times. He keeps writing me not to have a trial, not to have a trial. I've asked for a trial many times with him. I have not tried to stall this. I have not.

Look at the letters that have been written back to me and you'll see that I'm the one that asked for a trial. I'm the one that asked for a motion.

THE COURT: And now—

WOODARD: I asked for these things.

THE COURT: Why then did you dismiss Mr. Hakala when I told you—

WOODARD: I didn't exactly—well, you asked me could I work with him. I talked to him and I asked him again. He said no, that he felt it was better that he didn't represent me being the fact that I had already said something to you without him, he felt it was best that he did not represent me. He asked you to leave the courtroom. I never officially dismissed Mr. Hakala.

THE COURT: The record—

WOODARD: Mr. Hakala.

THE COURT: I think the record demonstrates to the contrary and I have fully advised you.

Now, here's how we're going to proceed. If you have any questions about procedure, as I told you, you ask me.

WOODARD: I don't know the procedure. That's one of the big things that—

THE COURT: I'll—

WOODARD: I don't know the procedure. I don't even know when to object and when to ask questions.

THE COURT: Then listen to me because I'm going to tell you.

The court went on to discuss the mechanics of the trial and the verdict slip in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The court asked defendant if she had any questions:

WOODARD: I just received copies of reports, copies of things, that I haven't even been able to look at, that I don't even have, I never even had before. I, I don't have a complete file of my case because I was never given a complete file of my case. I prepared questions this morning that I was, that I was not allowed to bring in things that I had, the notes that I had I was not allowed to bring in. Be-

cause it was not a, ah, a attorney written thing saying please allow me to bring in or anything like that. I don't have even a complete file of my case.

THE COURT: Well, if there's something that you want to introduce in evidence you let me know what it is.

WOODARD: I don't have a complete file of my case. I haven't even—I haven't—they've handed me things as I was coming in.

THE COURT: I have to know specifically what we're talking about. Just saying I don't have a complete file—

WOODARD: In my file I have a copy of my arrest record. I don't have a copy of everything. He handed me some paperwork.

THE COURT: What is it that you want?

WOODARD: I don't know what I'm supposed to have. I know the papers he handed me haven't been submitted to me to look at.

THE COURT: Well, you look those papers over. I imagine that he's going to want to put those in evidence, or some of them in evidence. Before I let the jury see any of them, I will ask you. I always do that.

All right.

WOODARD: I have paperwork that he handed me yesterday that I still am looking over because he just handed it to me yesterday. I haven't had a chance to even go over the records of this file, this case.

THE COURT: Ma'am, I have to tell you that I think I've explained everything to you completely fairly.

WOODARD: You have explained it but I haven't had a chance to read it.

THE COURT: And I have to tell you further—

WOODARD: I haven't had a chance to go over anything.

THE COURT: Listen to me. I'll tell you further, despite what you say, I think you're stalling here. You wanted a trial. You wanted to conduct it.

WOODARD: No, I didn't want to conduct it.

THE COURT: Well, you say that now.

WOODARD: I wanted a lawyer to conduct it. I just had a—

THE COURT: But you would not go forward with the lawyer—

WOODARD: I tried to go forward.

THE COURT: that you had.

WOODARD: I tried to go forward with Mr. Hakala.

THE COURT: No.

WOODARD: I talked to him a couple of times that day. I did try to go forward with him.

THE COURT: I believe the record speaks to the contrary. We're going forward. Let's see if the jury's present.

WOODARD: I'm not ready to go to trial. I'm not ready.

The jury was sworn and trial began. The government presented evidence and rested the same morning. Woodard rested after entering some documents and presenting no witnesses. The government and defendant made closing arguments and the court instructed the jury.[1] After deliberating for more than an hour, the jury returned a guilty verdict.

1. At a sidebar conference to discuss objections to the jury charge, Woodard asked if she could enter some drug treatment records into evidence. The court refused to admit them. Woodard stated that she did not realize how important they were to her case.

The court appointed counsel to represent her for sentencing and any post-trial matters. On August 21, 2001, the court sentenced Woodard to a term of imprisonment of 135 months, to be followed by a 36–month term of supervised release.

## II. DISCUSSION

Woodard asserts several interrelated points of error: that the district court wrongly denied her motions for substitution of counsel; that it allowed her to proceed *pro se* after inadequate colloquy; that it dismissed standby counsel after promising Woodard his assistance; and that it refused to allow her to revoke her waiver of counsel before the trial started.

### A. The Sixth Amendment right to counsel

█ Representation by counsel is a right of the highest order. *United States v. Proctor*, 166 F.3d 396, 401 (1st Cir.1999). In *Proctor*, we mapped out the complex relationship between a defendant's Sixth Amendment right to counsel and her right to self-representation. *Id.* at 401–02. There, we affirmed that the right to counsel is paramount: "Where the two rights are in collision, the nature of the two rights makes it reasonable to favor the right to counsel which, if denied, leaves the average defendant helpless." *Id.* at 401 (quoting *Tuitt v. Fair*, 822 F.2d 166, 174 (1st Cir.1987)).

█ Nonetheless, the Sixth Amendment does not provide an absolute right to counsel of a defendant's choosing. *United States v. Kneeland*, 148 F.3d 6, 12 (1st Cir.1998); *see also Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.") It is well-established that it is within the district court's discretion to force a defendant to choose between proceeding to trial with an unwanted attorney and representing herself. *See Proctor*, 166 F.3d at 402 and cases cited.

█ In weighing a defendant's right to choose her own counsel, we take into consideration its impact on "reasonable and orderly court procedure." *United States v. Poulack*, 556 F.2d 83, 86 (1st Cir.1977). Specifically, "a defendant has no right to representation by a particular attorney when such representation would require undue delay." *United States v. Hallock*, 941 F.2d 36, 44 (1st Cir.1991); *see also United States v. Allen*, 789 F.2d 90, 92 n. 4 (1st Cir.1986); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir.1976). Thus, when a defendant seeks new counsel, the court must balance her "interest in retaining counsel of his choice against the public's interest in the prompt, fair and ethical administration of justice." *United States v. Richardson*, 894 F.2d 492, 496 (1st Cir. 1990) (quoting *United States v. Panzardi Alvarez*, 816 F.2d 813, 817 (1st Cir.1987)). "Only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (internal quotation marks and citation omitted).

### B. Woodard's motions for substitution of counsel

█ Woodard first argues that the district court erred in denying her motions for substitution of counsel. We review the denial for abuse of discretion. *Proctor*,

166 F.3d at 401.[2] We accord "extraordinary deference" to the district court's decision where, as Woodard concedes here, the allowance of the motion would necessitate a last-minute continuance. *United States v. Pierce*, 60 F.3d 886, 891 (1st Cir.1995).

In *Allen*, 789 F.2d at 92, we set forth the principles governing cases in which a criminal defendant asks that appointed counsel be replaced. When a defendant voices objections to counsel, the trial court should "inquire into the reasons for the dissatisfaction." *Id.* In evaluating whether a district court's denial of motion for substitution of counsel constituted an abuse of discretion, we consider the following factors:

> the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense.

*Id.*

As an initial matter, we have some question about the applicability of the *Allen* factors to this case. Here, Woodard was represented by private counsel. Unlike a defendant with appointed counsel, she was not dependent on the court's permission to replace Hakala. We see no reason why, if dissatisfied with his representation, she could not have simply fired him and retained a different lawyer before trial was scheduled. This would have presented the trial court faced with a motion by counsel to withdraw with a more palatable alternative.

Even assuming that the *Allen* test applies, Woodard does not sufficiently demonstrate any abuse of discretion on the part of the district court. First, her request for new counsel was not timely. The issue was first raised at the status conference on January 3, 2001, thirteen days before the trial date set by the district court. After Hakala raised the issue of Woodard's desire for different counsel, the district court inquired as to why. Woodard's reason for her dissatisfaction with Hakala was that their relationship was "strained," that it was "not working out," and that she "would just feel a little bit more comfortable with another relationship." Hakala took it upon himself to elaborate, but added little in the way of substantive explanation. All told, the reasons presented to the district court in support of substitution of counsel on January 3 did not adequately support Woodard's motion. *See Allen*, 789 F.2d at 93 (requiring defendant to provide the court with "a legitimate reason for his loss of confidence").[3]

---

2. Woodard contends that our review is plenary, citing *Proctor*, 166 F.3d at 401. That case, however, centered on ambiguity in the scope of the motion: whether the defendant had requested counsel for the entire case or only for a motion to dismiss. *Id.* That "unusual feature of uncertainty" distinguished that case but is not present here. *Id.* In *Proctor*, the pivotal issue was "of necessity ... considered for the first time on appeal," *id.;* here, the parties agree that Woodard sought new counsel to litigate her motion to suppress and trial, and the district court explicitly considered those requests. Accordingly, the only issue before us is whether the district court properly exercised its discretion in denying Woodard's motions.

3. Woodard contends that she did not speak about the specifics of her problem with Hakala at the January 3 hearing because the court stated that "what passes between you and your attorney is private," and criticizes the court for conducting the colloquy in open court. Insofar as she was concerned about the government's presence, however, neither she nor Hakala requested to speak *ex parte*. Moreover, any concerns about attorney-client privilege did not prevent her from making explicit complaints in open court on January 16.

Woodard did not provide more explicit reasons for her desire for new counsel— e.g., her conflict with Hakala over the motion to suppress—until January 16, the first day of trial. We have consistently held that requests for substitution of counsel made on the day of trial are untimely. *E.g., Richardson,* 894 F.2d at 497–98; *Tuitt,* 822 F.2d at 172; *Allen,* 789 F.2d at 93. More specifically, the record indicates that the conflict between Woodard and Hakala about the motion to suppress was several months old and that their communication difficulties had existed "for months"; yet Woodard offered no explanation for why she did not complain earlier. *See Richardson,* 894 F.2d at 497–498 (in determining that a request for new counsel made the morning of trial was untimely, court noted that defendant had two months to express dissatisfaction with appointed counsel); *United States v. Mangual–Corchado,* 139 F.3d 34, 42 n. 18 (1st Cir.1998) (in affirming denial of motion to replace counsel, court stated that defendant failed to act until three weeks before trial, even though he claimed that counsel had kept him waiting five or six months for documents).

▆▆▆▆ Second, we hold that the district court's inquiry was adequate under the circumstances. The extent and nature of the inquiry may vary in each case; it need not amount to a formal hearing. *See United States v. Prochilo,* 187 F.3d 221, 229 n. 8 (1st Cir.1999). Here, after Woodard raised the issue of her dissatisfaction with Hakala, the district court immediately inquired as to the reasons for the dispute; determined that Hakala was prepared to proceed to trial; and asked Woodard what she believed the problem was. We have affirmed comparable inquiries as adequate. *E.g., Richardson,* 894 F.2d at 497 (district court questioned lawyer and client regard-

ing nature of dispute and preparedness for trial); *United States v. Torres,* 793 F.2d 436, 438 (1st Cir.1986) (court questioned defendant on the reasons for his dissatisfaction); *Allen,* 789 F.2d at 93 (court "invited appellant to make a statement, listened to his reasons for being dissatisfied with his counsel, and found them to be without merit").

▆▆▆▆ Third, we are not convinced that Woodard demonstrated a "total lack of communication" that would establish good cause for substitution of counsel. *See Allen,* 789 F.2d at 92. Good cause cannot be determined "solely according to the subjective standard of what the defendant perceives." *Id.* at 93 (quoting *McKee v. Harris,* 649 F.2d 927, 932 (2d Cir.1981)). Loss of trust, standing alone, is insufficient; rather, "[t]he defendant must provide the court with a legitimate reason for his loss of confidence." *Id.*

Here, Woodard's primary argument in support of good cause was Hakala's failure to file a motion to suppress. The district court determined that Woodard sought to suppress the evidence seized from her house on the ground that a detective included information in the search warrant affidavit that he knew to be false. The court also considered her claim that she was being prosecuted merely because she had traveled to Jamaica. Only then did it deny Woodard's request.

▆▆▆▆ Without more, Hakala's failure to file a suppression motion that he considered to be meritless does not constitute good cause for substitution of counsel. An attorney is not obligated to pursue weak options "when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial." *Tuitt,* 822 F.2d at 172 (quoting *Cepulonis*

*v. Ponte,* 699 F.2d 573, 575 (1st Cir.1983)).[4]

In sum, after consideration of the *Allen* factors, we conclude that the district court did not abuse its discretion in denying her motion for substitution of counsel.

## C. *Woodard's decision to proceed pro se*

Woodard's next argument is that the district court denied her right to counsel by permitting her to represent herself. Specifically, she contends that the district court failed to warn her of the pitfalls of self-representation as required by *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).[5] We review the district court's decision that a defendant may proceed *pro se* for abuse of discretion. *Proctor,* 166 F.3d at 401.

A defendant who seeks to relinquish her right to counsel must so state in unequivocal language. *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525. The waiver must be knowing, intelligent and voluntary. *Proctor,* 166 F.3d at 401. The trial judge must explicitly make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (internal quotation marks and citation omitted). In determining whether there is a competent waiver of the right to counsel, the judge "must investigate as long and as thoroughly as the circumstances of the case before him demand." *Proctor,* 166 F.3d at 402 (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 723–24, 68 S.Ct. 316, 92 L.Ed. 309 (1948)). We are guided by the principle that "[c]ourts must indulge in every reasonable presumption against waiver of the right to counsel." *Id.*

The district court conducted the self-representation colloquy after completing the plea colloquy. In the plea colloquy, the court advised Woodard of the seriousness of the charge against her and the penalties she faced; described various substantive and procedural aspects of the trial, including empanelment, the government's burden of proof, opening and closing arguments, questioning of witnesses, the concept of reasonable doubt, and the nature of the sentencing guidelines; and confirmed her understanding of the plea process. The court had additional information about Woodard by way of the pre-plea presentence report (PSR), which described Woodard's college training, business experience, and experience with the judicial system (as evidenced by her prior convictions for drug trafficking and other crimes).

After Woodard announced her wish to proceed *pro se,* the court warned her that

---

4. In her letter submitted on January 16, Woodard also referenced problems in contacting Hakala. The record indicates that she had spoken with Hakala at least twice since the January 3 conference, as well as repeated communication about the motion to suppress and other issues in the previous months. Hence, we cannot conclude that this complaint constitutes good cause.

Nor does her complaint that she did not receive discovery materials suffice. Although she did not specify what she thought was missing, the record indicates that she had received copies of the search warrant materials. To the extent that Woodard's January 16 letter suggested she wanted police reports and laboratory certifications regarding individuals from whom the police had received information used in procuring the search warrant but whom the government did not intend to use as witnesses at trial, the materials were not discoverable.

5. Woodard also contends that the district court's denial of her motions for substitution of counsel rendered her decision to proceed *pro se* involuntary. Because we hold that the district court did not err in denying those motions, we conclude that the decision to proceed *pro se* was not involuntary.

"it's a big mistake to represent yourself." It reminded her that she lacked the experience or ability of an attorney: "You don't know how to pick a jury. You don't know ... how to ask questions like a lawyer does." When Woodard held fast to her decision, the court suggested that she allow Hakala to handle the trial or to empanel the jury.

It is true that the district court's colloquy cannot be fairly described as painstaking. In light of its knowledge of Woodard's circumstances from its questioning and the PSR, however, we think it was adequate to ensure that her waiver was knowingly and intelligently made. *See United States v. LaBare,* 191 F.3d 60, 67–68 (1st Cir.1999) (upholding waiver in which defendant with prior convictions was told only that he would be a "fool" for representing himself); *Kneeland,* 148 F.3d at 11 (upholding waiver in which the court told defendant that he would be at a significant disadvantage if he proceeded *pro se* ); *United States v. Benefield,* 942 F.2d 60, 64–65 (1st Cir.1991) (defendant with seventh grade education effectively waived right to counsel based on prior involvement in criminal trials).

### D. *The district court's dismissal of Hakala*

Next, we consider the district court's dismissal of Hakala after Woodard had waived her right to counsel. Woodard did not object when the district court excused Hakala from the courtroom. Accordingly, we review for plain error. Fed.R.Crim.P. 52(b).

■ Woodard had no entitlement to Hakala or to any other attorney as standby counsel. "A defendant has no right to hybrid representation." *United States v. Nivica,* 887 F.2d 1110, 1121 (1st Cir.1989). Although a trial court may appoint standby counsel against a defendant's wishes, it is not required to do so. *Kneeland,* 148 F.3d at 13; *see also United States v. Webster,* 84 F.3d 1056, 1063 (8th Cir.1996) ("Appointment of standby counsel is within the discretion of the district court, and a *pro se* defendant does not enjoy an absolute right to standby counsel.")

■ Woodard neither expressly asked for standby counsel nor objected to Hakala's dismissal. When the district court discussed Hakala's remaining in the courtroom, Woodard did not assent to using his services. Nor did she accept Hakala's assistance when the court suggested specific functions that he might perform. When the district court offered that Hakala could represent Woodard at trial while she handled the motion to suppress, Woodard did not answer directly, but rather restated her desire for different counsel. While initially Woodard agreed to let Hakala select the jury, she later decided to perform that task herself.

Woodard contends that because the court had told her that one of her options was to represent herself with Hakala present, her decision to proceed *pro se* was rendered involuntary by the subsequent dismissal of Hakala. The record does not support this argument. There is no indication that Woodard's waiver of counsel, or any other action, was made in reliance on the court's assurance that standby counsel would be available. Indeed, as her approval of the standby counsel idea came only after Hakala had left and was unlikely to be available, it suggests that her aim was to frustrate the trial process, utilizing whatever argument was closest at hand at the moment.

■ Still, we are troubled by the district court's dismissal of Hakala without further inquiry. Where a district court promotes the idea of a "hybrid representation" in which defendant and counsel divide duties, a defendant might plausibly claim to believe that declining counsel's

services in one capacity does not necessarily mean dismissing him altogether. Regrettably, the court did not attempt to clarify the situation by consulting with Woodard before dismissing Hakala from the courtroom. Our misgivings do not rise to the level of reversible error, however, in light of the specific facts of this case and our standard of review.

### E. *Woodard's attempt to revoke her waiver of counsel*

 Finally, Woodard contends that the district court erred in denying her request for counsel just before the jury was sworn on January 18, 2001. We review this decision for abuse of discretion. *United States v. Betancourt–Arretuche*, 933 F.2d 89, 93–94 (1st Cir.1991). Again, the standard of review is particularly demanding where, as here, the defendant's request necessarily requires a continuance. *United States v. Ademaj*, 170 F.3d 58, 65 (1st Cir.1999) ("We accord 'extraordinary deference' to trial court rulings on 'last-minute' requests for a continuance.").

A district court may refuse a defendant's request to withdraw · from self-representation after a valid waiver "if a defendant seeks counsel in an apparent effort to delay or disrupt proceedings on the eve of trial, or once trial is well underway." *Proctor*, 166 F.3d at 402; *see also Betancourt–Arretuche*, 933 F.2d at 93–94 (request for eleventh-hour change in representation is within trial court's discretion). At the time Woodard sought to revoke her waiver of counsel, it was the scheduled day of trial and the jury had already been selected. Woodard had rejected Hakala's services as standby counsel and had not availed herself of the opportunity to retain new counsel. The district court expressly found that her request for counsel was an attempt to delay the trial. In light of that court's "superior vantage point for evaluating matters such as these," we owe considerable deference to that finding. *Pierce*, 60 F.3d at 891. Accordingly, we see no reason to disturb the court's denial of Woodard's request.

### III. *CONCLUSION*

In sum, we find no reversible error in the district court's treatment of Woodard's requests for substitution of counsel, her decision to proceed *pro se*, and her waiver of self-representation. We remain troubled, however, by the court's dismissal of Hakala after offering his services as standby counsel, and we think the better practice is not to engage in future similar dismissals absent consultation with the defendant.

We *affirm* the judgment against Woodard on this ground and on all other grounds presented.