# United States Court of Appeals
## For the First Circuit

No. 01-2059

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN WAYNE MYERS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,

and Schwarzer,* Senior District Judge.

Tina Schneider for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

June 25, 2002

_____

*Of the Northern District of California, sitting by designation.

**SELYA**, **Circuit Judge**.  A jury in the District of Maine found defendant-appellant John Wayne Myers guilty of being a felon in possession of ammunition and firearms.  After the district court sentenced him as an armed career criminal, Myers appealed.  His principal challenge is to the district court's refusal to appoint substitute counsel for him at sentencing.  Discerning no infirmity in this or any other respect, we affirm the conviction and sentence.

## I.

## Background

The appellant is a recidivist criminal who, until shortly before his most recent arrest, resided in Wisconsin.  In October of 2000, he had a dispute with his parole officer and fled the state.  The Wisconsin authorities warned their Maine counterparts that the appellant might attempt to contact or harm Gene Richardson (a Maine resident).  When a deputy sheriff inquired, he found that the appellant had approached Richardson but had not behaved menacingly.  The authorities nonetheless elected to keep an eye on the situation.

The appellant soon returned to the Richardson homestead.  The deputy, assisted by several state troopers, attempted to detain him.  A vehicular chase led to the appellant's apprehension.

An inventory of the appellant's automobile disclosed four boxes of bullets.  A subsequent search of the area traversed during

-2-

the chase — prompted by a report that the appellant had thrown an object out of his car window while attempting to escape — yielded a .357 magnum handgun. Later, a citizen turned in a .22 caliber pistol found in the same general vicinity. Further investigation revealed that the ammunition and the weapons belonged to a resident of Houlton, Maine, who claimed that they had been pilfered. The appellant denied any knowledge of the bullets, the guns, or the theft.

On November 29, 2000, a federal grand jury returned a two-count indictment that charged the appellant with being a felon in possession of ammunition and firearms. See 18 U.S.C. §§ 922(g)(1), 924(e) (2000). The appellant was without funds, and, pursuant to the Criminal Justice Act, id. § 3006A, the district court appointed counsel for him in the person of attorney Peter Rodway. From the start, the two men squabbled over defense strategy. Nevertheless, the appellant voiced no complaint to the district court and Rodway soldiered on, representing the appellant vigorously both at a suppression hearing and at trial.

Notwithstanding Rodway's valiant efforts, the jury found the appellant guilty on both counts. The district court scheduled the disposition hearing for July 10, 2001 (some four months after the verdict date). The probation department prepared and delivered the presentence investigation report (PSI Report) well in advance. Rodway reviewed it with the appellant.

Five days before the putative sentencing date, Rodway moved to withdraw as counsel. In his motion, he explained that the appellant had dismissed him and that "[t]he attorney-client relationship ha[d] broken down to the point that counsel is not able to effectively communicate with the [client]." At a chambers conference held on July 10, Rodway reiterated his desire to withdraw. The judge prudently decided to conduct an inquiry.

In open court, Judge Carter engaged in an extensive three-way colloquy with Rodway and the appellant. The judge began by querying Rodway about his reasons for moving to withdraw. Rodway explained that he and the appellant had been at loggerheads for some time, but that, as of late, communication had become especially difficult. When prompted to furnish specifics, Rodway replied only that he thought "it [was] not a good idea" for him to continue to represent the appellant.

Judge Carter then asked the appellant why the public should bear the expense of retaining a new lawyer. The appellant responded that he was dissatisfied with the defense that Rodway had offered at trial. When the appellant finished his soliloquy, Rodway interjected that the appellant's comments laid bare the root of the current conflict: Rodway wanted to concentrate his energies on the sentencing phase whereas the appellant insisted upon rehashing the trial. Rodway suggested that a new lawyer might have

a better chance of impressing upon the appellant the need to get beyond a battle that already had been fought and lost.

Having heard from all parties in interest, Judge Carter denied the motion. He pointed out that Rodway had done a creditable job at trial, and that, in all events, the reasons given by the appellant in support of his request for the appointment of substitute counsel did not amount to good cause.

The proceeding then morphed into a disposition hearing. Rodway interposed numerous objections to the PSI Report, argued them staunchly, and conferred with his client when the occasion demanded. When all was said and done, the judge sentenced the appellant at the top of the applicable guideline sentencing range — imposing a 235-month incarcerative term — but rejected the government's ardent request that he depart upwardly for reckless endangerment during flight. See USSG §2K2.1(b)(4) (2001). This appeal followed.

## II.

## Analysis

We subdivide our analysis into segments (corresponding to the appellant's arguments).

## A.

## The Sixth Amendment Claim

The appellant's principal assertion is that the district court's denial of the motion to withdraw violated his Sixth

Amendment right to counsel of his choice. We first limn the applicable legal standards and then address the claim.

1. **The Standards**. From a theoretical standpoint, the appellant's principal assertion rests on a solid foundation. The Supreme Court long has recognized that a criminal defendant "should be afforded a fair opportunity to secure counsel of his own choice." Powell v. Alabama, 287 U.S. 45, 53 (1935). This is a right of the highest priority. United States v. Proctor, 166 F.3d 396, 401 (1st Cir. 1999). We caution, however, that although the right extends to indigent defendants, it does not afford them carte blanche in the selection of appointed counsel. See United States v. Machor, 879 F.2d 945, 952 (1st Cir. 1989) (declaring that the right "is not absolute"); see generally Wheat v. United States, 486 U.S. 153, 159 (1988) (explaining that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers").

Once a court appoints an attorney to represent an accused, a subsequent decision to replace that attorney is committed to the informed discretion of the appointing court. In exercising that authority, the court must take into account the totality of the circumstances then obtaining (including the need for economy and efficiency in the judicial process). United States v. Richardson, 894 F.2d 492, 496 (1st Cir. 1990); United States v.

Poulack, 556 F.2d 83, 86 (1st Cir. 1977). This means that there must be good cause for rescinding the original appointment and interposing a new one. United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986). Good cause depends on objective reasonableness; it cannot be gauged solely by ascertaining the defendant's state of mind. In other words, "[l]oss of trust, standing alone, is insufficient." United States v. Woodard, ___ F.3d ___, ___ (1st Cir. 2002) [No. 01-2229, slip op. at 22]. By like token, not every bump in the road entitles a criminal defendant to have his lawyer cashiered and a new one appointed. See generally Morris v. Slappy, 461 U.S. 1, 14 (1983) (holding that the Sixth Amendment does not "guarantee[] a 'meaningful relationship' between an accused and his counsel"). At a bare minimum, good cause demands that a defendant's professed loss of confidence in his attorney be founded upon a legitimate reason.

Under ordinary circumstances, an appellate court's inclination will be to defer broadly to the trial court in regard to such a decision. Deference makes perfect sense, for the trial court is in the best position to assess the qualitative aspects of the complex relationship between a defendant and his appointed counsel. Consequently, that court is the logical arbiter of whether (and under what circumstances) such a defendant requires substitute counsel. We will overrule such a decision only if it

constitutes an abuse of the trial court's discretion.  United States v. Diaz-Martinez, 71 F.3d 946, 950 (1st Cir. 1995).

Although this is a deferential standard of review, it does not signify that the court of appeals will rubberstamp a trial court's rulings on such matters.  When a defendant seeks the replacement of appointed counsel, we expect the trial court to conduct an appropriate inquiry into the source of the defendant's dissatisfaction.  See Allen, 789 F.2d at 92.  A failure to inquire may result in the reversal of an ensuing conviction.  United States v. Prochilo, 187 F.3d 221, 228-29 (1st Cir. 1999).  Nor is that all:  in assessing the district court's denial of such a motion, we will consider not only the adequacy of the court's inquiry but also factors such as the timeliness of the motion for substitution and the nature of the conflict between lawyer and client.  Allen, 789 F.2d at 92.  We will give special attention to the trial court's conclusion that the conflict stopped short of "result[ing] in a total lack of communication preventing an adequate defense."  Id.

**2.  The Ruling Below.**  In this instance, the appellant posits that the district court abused its discretion by denying the withdrawal motion.  In his view, the court took aim at the wrong target, zeroing in on Rodway's performance rather than the deteriorated attorney-client relationship.  The proper focus, he continues, would have shown that a serious conflict existed, warranting the relatively modest inconvenience involved in a

postponement of sentencing to allow new counsel to enter the case and get up to speed.

This argument has a patina of plausibility. After all, there was evidence of a strained relationship between Rodway and the appellant, and postponing a sentencing is generally not as disruptive as postponing an impending trial. There is, however, another side to the story.

Rodway's motion came late in the day: it was filed months after the conflict first developed, and a mere five days before the scheduled sentencing. Nor did the appellant ever explain his failure to register a complaint earlier in the proceedings. This chronology plainly militates against the granting of a motion for substitution of counsel. See, e.g., United States v. Mangual-Corchado, 139 F.3d 34, 42 n.18 (1st Cir. 1998); Richardson, 894 F.2d at 497-98.

Then, too, the district court responded appropriately to the motion. While there is no invariable model for a trial court's inquiry into an allegedly embattled attorney-client relationship, Woodard, ___ F.3. at ___ [slip op. at 21], the inquiry conducted here comprised a thoughtful probe into the nature and duration of the asserted conflict. The adequacy of the inquiry lends added weight to the trial court's ultimate determination. See Allen, 789 F.2d at 92; see also United States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995).

Last — but far from least — the nature of the conflict is itself revealing.  Though questioned, neither protagonist offered the court specifics as to why Rodway could not function effectively on the appellant's behalf <u>at</u> <u>sentencing</u>.  Indeed, the discord between lawyer and client centered exclusively on trial issues — and the trial had ended.  What remained was the disposition hearing, and Rodway and the appellant had no apparent disagreement relevant to any sentencing issues.

Let us be perfectly clear.  We can envision circumstances in which, even after the conclusion of trial, a falling-out between a defendant and his counsel so threatens the former's rights that the appointment of a new attorney is warranted.  Here, however, no such circumstances are evident.  By the time that Rodway moved to withdraw, the probation department had completed its interviews and compiled the PSI Report.  Counsel's remaining tasks — chiefly, to argue whether objections to the PSI Report should be sustained, where within the guideline sentencing range the appellant should be placed, and why no upward departure should be essayed — bore no relationship to the "trial-type" issues that had produced rancor between attorney and client. A defendant who seeks the replacement of appointed counsel must show more than the mere fact of a disagreement; he must show that the conflict between lawyer and client was so profound as to cause a total breakdown in communication, precluding the lawyer from effectively litigating

the issues remaining in the case.[1]  Cf. Allen, 789 F.2d at 92 (explaining that the trial court must determine whether the conflict "was so great that it resulted in a total lack of communication preventing an adequate defense").

The short of the matter is that the information before the district court was susceptible of two rational (though opposite) conclusions.  Which conclusion prevailed depended entirely on what inferences the presider chose to draw.  Given this type of standoff, the tie-breaker often will be the standard of review.  So it is here.

The district court carefully examined the timing of the withdrawal motion, inquired into its basis, questioned Rodway and the appellant in depth about their reasons for seeking replacement counsel, and concluded that the acrimony between the two did not jeopardize the effective performance of the legal services yet to be rendered.  In so doing, the court was entitled to weigh factors such as the timing of the motion, Rodway's intimate knowledge of the case, the likely value of that knowledge at sentencing, the conclusory nature of the reasons offered by the appellant and the lawyer to support the request for new counsel, and the absence of any discernible disagreement about sentencing issues.  The district

---

[1]Of course, there will be infinite variations on this theme. One such variation includes situations in which an irreconcilable conflict develops between lawyer and client regarding an issue properly within the client's control.  Even then, however, the conflict must be material to an issue that is still live.

court's ultimate conclusion — that no good cause existed for the appointment of new counsel and the concomitant delay in sentencing that such an appointment would entail — was a quintessential judgment call. This judgment call fell squarely within the realm of the court's discretion. See Machor, 879 F.2d at 952-53 (explaining that when the presider had made due inquiry in respect to a request for replacement of counsel and reached a reasonable conclusion, the decision should be upheld); see also Richardson, 894 F.2d at 497-98 (rejecting a similarly postured appeal when the district court supportably determined that the defendant had failed to demonstrate a conflict sufficient to render counsel's representation inadequate).

## B.

## The Equal Protection Claim

The appellant next argues that the district court abridged his rights under the Fifth Amendment's Equal Protection Clause by telling him: "You have to convince me that the public should bear the expense of appointing you a new lawyer." The appellant contends that this statement evinces impermissible discrimination on the basis of indigency. We do not agree.

Read in context, we take the district court's remark as a comment directed at the appellant's desire to switch horses in mid-stream, not at his indigency. Even if the latter were the

-12-

case, the appellant's argument would fail for a multitude of reasons. We mention only three.

In the first place, Rodway continued to represent the appellant to the bitter end, and represented him proficiently. Thus, the appellant was at no time deprived of his constitutional right to counsel. In the second place, wealth is not a suspect classification for purposes of the Equal Protection Clause. See San Antonio Ind. Sch. Dist. v. Rodriguez, 411 U.S. 1, 29 (1973). And, finally, the appellant's indigency did not cause a complete deprivation of the right to counsel (and, therefore, no violation of the Equal Protection Clause exists). Id. at 23-24 (holding that there can be no equal protection violation when "lack of personal resources has not occasioned an absolute deprivation of the desired benefit"). For these reasons, the appellant's second claim founders.

**C.**

**The Pro Se Brief**

There is one more hill to climb. The appellant has filed a supplemental pro se brief in which he raises several arguments addressed to the conduct of the trial and the sufficiency of the government's proof. He makes three main points: (1) the deputy relied on an unsigned Wisconsin warrant to instigate the arrest; (2) the government suppressed exculpatory evidence and introduced false testimony in its case in chief; and (3) the government failed

-13-

to forge a chain of custody sufficient to link the guns and ammunition to the appellant. This asseverational array seems better suited to a petition for post-conviction relief. See 28 U.S.C. § 2255 (2000). We nonetheless explain briefly why, to the extent (if at all) that the arguments are cognizable on direct review, we find them unpersuasive.

First, it is beyond cavil that the Wisconsin authorities informed their Maine counterparts that the appellant was in violation of his parole. On the basis of that information, the latter had sufficient reason to stop the appellant's vehicle. See United States v. Hensley, 469 U.S. 221, 231 (holding that "police in one jurisdiction [may] act promptly in reliance on information from another jurisdiction" in such situations). The ensuing chase furnished unassailable grounds for the eventual arrest.

Second, the record before us does not support an inference of wrongdoing on the part of the government. While there were some inconsistencies in the testimony of various police officers (effectively exploited by Rodway in both cross-examination and closing argument), the record reveals nothing amounting to either a Brady violation, see Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused . . . violates dues process where the evidence is material either to guilt or to punishment"), or the knowing use of perjurious testimony, see Napue v. Ill., 360 U.S.

-14-

264, 269 (1959) (stating that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"). If there is more light to be shed on these allegations, the appellant is free to develop them on a petition for post-conviction relief.

Finally, the proof establishing a chain of custody in this case was ample. Various witnesses described in detail how they came upon the boxed bullets and the firearms, respectively, and what they did with those items prior to trial. Given the circumstantial evidence here (i.e., that ammunition was found inside the car that the appellant had been driving, that the appellant had been observed throwing an object out of the car window, that both guns were found near the scene of the chase, and that the guns and ammunition had a common origin), no more was exigible. The links in a chain of custody need not be welded to one another, but, rather, may be more loosely connected. See United States v. Ladd, 885 F.2d 954, 957 (1st Cir. 1989) (explaining that "the prosecution's chain-of-custody evidence must be adequate — not infallible"). To the extent that there were any weak links in the instant chain — notably, the time between the end of the chase and the time when the guns were found — their effect on the authenticity of the evidence was a matter within the exclusive province of the jury. See id.

## III.

## Conclusion

We need go no further.  We have painstakingly reviewed the record, the briefs, and the arguments ably presented by counsel.  For aught that appears, the appellant was fairly tried, justly convicted, and lawfully sentenced.

**Affirmed**.