Rockingham
No. 2009-451

THE STATE OF NEW HAMPSHIRE

v.

SAAD MOUSSA

Argued: February 16, 2012
Opinion Issued: August 31, 2012

110

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Saad Moussa, appeals his convictions, and sentences, on three counts of stalking, *see* RSA 633:3-a (Supp. 2004) (amended 2005, 2006), entered following a jury trial in Superior Court (*McHugh*, J.). We affirm.

*I. Background*

The jury could have found, or the record supports, the following facts. In 2005, the Rockingham County grand jury returned three indictments against the defendant, each alleging a separate incident of stalking the victim, to whom he had been married for approximately eleven years. According to the victim's testimony, they were divorced at the time of trial. Each charged incident involved the defendant allegedly sending a letter to the victim "after having been served with or otherwise provided notice of a protective order issued by the Salem Family Court on 12/10/04, that prohibited him from having contact with [her]."

On the morning of trial, the defendant's appointed lawyer, Neil Reardon, informed the court that he "had spoken with [the defendant] earlier and [the defendant] asked [him] not to represent him," and that the defendant had "also sent [him] correspondence to that effect." After hearing from the defendant, the court stated: "Well, here's where we are. I mean, if you don't want him to represent you, I'm not going to force it on you, but I'm not going to continue the case either, you're going to represent yourself. If you want to do that, you can." The defendant confirmed that his "final decision" was that he did not want Reardon. He said that he would represent himself, but asked the court to give him "a little bit more time" to conduct the investigation he claimed Reardon had not done. The court denied that request and asked Reardon to stay in the courtroom in case "something should come up or [the defendant] changes his mind." On the second day of trial, after the defendant had absented himself from the proceedings, the court released Reardon from further involvement in the case.

At trial, the victim testified that each of the letters was written in Arabic in the defendant's handwriting. Nevertheless, each letter purported to be

from someone other than the defendant — specifically, in the words of the first letter, "a benefactor and a family friend." The first and second letters were purportedly sent by Carlos Santana, with return addresses of New York City and the Bronx, respectively. The third had no return address but was postmarked from Manchester, New Hampshire. The State produced evidence that the defendant's fingerprints were found on each letter. The victim also testified that some of the letters repeated threats the defendant had made to her in the past: "Exactly — same words in them."

The third letter mentioned "a Lebanese who was in prison with [the defendant] and he got out from jail." The letter further stated, "As far as I know, that guy seeking trouble." Salem Police Sergeant Eric Lamb testified that he investigated that claim and discovered that an individual named Oner Nusret had been incarcerated with the defendant and had been released. The victim testified that she did not know anyone by that name.

On cross-examining the victim, the defendant inquired how he could have sent a letter to her if he was in custody at the time. He asked, "Does she have a stamp from the jail or not?" The State addressed this issue in its closing argument:

> [The defendant] says to you, I couldn't possibly have sent these [letters]. He told you he was incarcerated at the time and they don't come from the jail. Folks, no one is saying he put these in the mailbox himself. You're not required to find that he did. It's not something that has to be proven beyond a reasonable doubt.
>
> . . . Nothing is going to prevent him from putting this letter in another envelope, sending it to a friend who can drop it in the mail because he knows these letters can't come from him.

The defendant was convicted of all three counts and sentenced on each to three and a half to seven years in state prison, to run consecutively and to run consecutively to the defendant's previously-imposed sentences. He now appeals his convictions and sentences.

The defendant argues that the trial court erred in: (1) requiring him to choose between self-representation and representation by a lawyer he wanted to dismiss; (2) making certain evidentiary rulings; (3) denying his request for counsel at sentencing; and (4) imposing felony sentences. We address each argument in turn.

## II. Analysis

### A. Representation Choice

The defendant first contends that because "[t]he right to counsel encompasses the right to the effective assistance of counsel," the trial court

could not put him "to the choice between representation at trial by a lawyer who has deficiently prepared for trial, and self-representation." While the defendant's claim implicates his constitutional right to counsel, he has not cited a specific provision of the State Constitution on this issue either below or on appeal. We therefore address his claim only under the Sixth Amendment to the Federal Constitution. *See State v. Dellorfano*, 128 N.H. 628, 632-33 (1986).

■ "It is well-established that it is within the [trial] court's discretion to force a defendant to choose between proceeding to trial with an unwanted attorney and representing [him]self." *United States v. Woodard*, 291 F.3d 95, 106 (1st Cir. 2002).

> The right of an accused to counsel of his choice . . . is not absolute. . . . Thus, a trial court has discretion to limit the exercise of the right, and, in doing so, should balance the defendant's interest in retaining counsel of his choice against the public's interest in the prompt, fair and ethical administration of justice.

*United States v. Richardson*, 894 F.2d 492, 496 (1st Cir. 1990) (quotation omitted). We therefore review the trial court's ruling on this issue for an unsustainable exercise of discretion. *Cf. Woodard*, 291 F.3d at 106 (appellate court reviews denial of request for substitute counsel for abuse of discretion); *State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

■ The defendant did not request substitute counsel, but instead sought a continuance to prepare to proceed *pro se*. Nevertheless, the issue is analogous to a request for substitute counsel because the crux of both claims is the unconstitutionality of a forced choice between self-representation and ineffective assistance of counsel. *Cf. Woodard*, 291 F.3d at 106. Accordingly, we find the following test, from the United States Court of Appeals for the First Circuit, instructive:

> When a defendant voices objections to counsel, the trial court should inquire into the reasons for the dissatisfaction. In evaluating whether a [trial] court's denial of [a] motion for substitution of counsel constituted an [unsustainable exercise] of discretion, we consider the following factors: the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense.

*Id.* at 107 (quotations and citation omitted).

With regard to the first factor, the State argues that the defendant "waited until the day of trial to tell the court he was dissatisfied with" Reardon. The defendant counters that he expressed concerns about Reardon's representation as early as January 5, 2009, two months before the start of trial on March 16, 2009. The record of the pretrial conference on January 5 indicates that the defendant had concerns about discovery and the infrequency of communication between Reardon and himself. He did not attempt to dismiss Reardon at that time, however, and the court addressed his concerns about discovery by continuing trial for two months and securing Reardon's agreement that if, after having reviewed the letters at issue, "there's something in those letters that ma[de] [him] think that it's in [the defendant's] best interest to contact witnesses and have them potentially testify, . . . [he] would do that."

The defendant's first attempt to dismiss Reardon appears to have been in a letter to him dated February 21, 2009, claiming that although he had represented the defendant for nearly two months and had almost one month to conduct discovery, he did nothing. The defendant stated, "you didn't do anything or you file any motion in my behalf in this case, and NO visit from you." The letter, which was sent to the trial court, concluded, "I believe the communication between us has broken down, and I NO longer wish for you to represent me." In a letter to the court dated the same day, the defendant stated that he would like to address these issues "at the hearing on March 5," and requested to be transported to the court for the hearing. There appears to have been no hearing on March 5. Thus, the defendant contends that his "first opportunity . . . to address the court in person came on March 16, the first day of trial."

The defendant asserts that the foregoing facts belie the inference urged by the State that he waited until the commencement of trial to complain about Reardon "in order to disrupt the proceedings." Regardless of the defendant's motivation, however, the remedy he sought would have "necessitate[d] a last-minute continuance," and we therefore "accord extraordinary deference to the [trial] court's decision" on the matter. *Id.* (quotation omitted).

The second factor assesses "the adequacy of the court's inquiry into the defendant's complaint." *Id.* (quotation omitted). Here, the court allowed the defendant to explain his dissatisfaction with Reardon. The defendant stated that communications with Reardon had "broken down" and that Reardon had failed to conduct a proper investigation. The defendant explained that he had provided Reardon with a list of witnesses he wanted to subpoena, but Reardon had declined to subpoena nearly all of them. The defendant maintained that his witnesses could have sent the letters to his wife. He also

stated that he wanted to call a witness from the jail where he was incarcerated to testify that all mail sent from there was stamped. The lack of such a stamp on the letters to his wife, he contended, would prove that those letters were not sent from the prison, and thus, inferentially, could not have been sent by him. He stated that his wife had access to his office, seeming to suggest that she could have obtained paper with his fingerprints on it. In addition, he wanted to identify any other fingerprints on the letters, as they could have been from "the person who sent that letter to [his] wife."

The court then sought input from Reardon, who stated that the defendant wanted him to perform an investigation that he thought was unnecessary: "[T]here's relevant evidence in this case as to whether or not [the defendant] wrote these letters and his fingerprints are on the letters and other fingerprints could be or could not be, but that's subject for cross-examination." He further explained:

> [H]e wants me to pursue frivolous avenues that don't go anywhere and I've tried to explain that to him and I don't want to do nonsensical things in front of a jury because . . . it will only hurt his case. And I'm trying to help this man if he'd only listen to me. But he wants me to pursue evidence and witnesses that aren't relevant, Judge.
>
> I mean, I went through his witness list with him and there were a couple of witnesses that I think are relevant until I inquired of one and he definitely indicated that he didn't have any relevant information.

We conclude that the court conducted an adequate inquiry.

■ The final factor considers "whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." *Id.* (quotation omitted). In other words, the reviewing court must determine whether there was good cause for substitution of counsel. *United States v. Allen*, 789 F.2d 90, 93 (1st Cir. 1986). "Good cause for substitution of counsel cannot be determined solely according to the subjective standard of what the defendant perceives." *Id.* (quotation omitted). In this case, we must determine whether Reardon's preparation was so deficient as to constitute ineffective assistance. *Cf. Monroe v. United States*, 389 A.2d 811, 820 (D.C. 1978) (noting that "allegations of the inability of counsel to render effective assistance at trial due to lack of preparation rise to the level of a claim of a Sixth Amendment deprivation").

■ "An attorney is not obligated to pursue weak options when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial." *Woodard*, 291 F.3d at 108 (quotation omitted).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).

The defendant argues that Reardon's assertion that he could make the point about the lack of a prison stamp on cross-examination, and the trial court's finding on that issue, "demonstrated a failure to understand the nature and significance of the evidence." He contends that "[a]t the March 16, hearing, [he] proffered that jail policies would have prevented him from enclosing the . . . letters and envelopes in mail sent from the jail even to a third person, without the letters and envelopes bearing a jail stamp."

We note that it is not clear that the defendant's proffer related to the internal contents of an envelope mailed from the prison. The defendant told the trial court that he had twice spoken with a prison official, whom he identified as "Captain Church" or "Lieutenant Captain Church," who had "said no mail sent from the prison, okay, from the — from the jail without stamp. . . . I need letter sent[] out from the prison should be stamped. As the result of what I see in the copy, there's no stamp present and that letter is not sent in the prison." He stated that even if the envelope was his, "you need that envelope sent from the prison and should be stamped."

Even assuming, however, that the defendant did make such a proffer, we find no error. The State notes that Reardon did not say that he failed to investigate the jail's mail policy, but rather that he planned to cross-examine the State's witnesses on that issue. It then argues:

> Reardon's remarks strongly suggest that he had made such an inquiry, and had discovered that, in fact, the jail would only have stamped the outer envelope, thus making it possible for the State's theory to be valid. It is entirely understandable that Reardon did not make his comments more explicit, since this

would have made the State's job easier. His comment that he was "reserving those issues for cross-examination," implied that he was planning to exploit the State's failure to call a jail witness who could confirm this policy. It seems more than a possibility that the trial court in this case understood Reardon's remarks in this light, and therefore urged the defendant for a second time to retain Reardon as his counsel.

(Citations omitted.)

█ We, of course, have no way of knowing whether the State's supposition is true. This uncertainty, however, underscores the high degree of deference with which we review counsel's performance. *See id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). The defendant here has failed to overcome that presumption. "[A]pplying a heavy measure of deference to" Reardon's judgment, we cannot say that his strategic decision not to subpoena Church was not supported by reasonable professional judgment. *Id.* at 691. Accordingly, the trial court did not unsustainably exercise its discretion in requiring the defendant to choose between self-representation and representation by Reardon.

*B. Evidentiary Rulings*

█ The defendant next argues that certain evidentiary rulings by the trial court constituted plain error.

> The plain error rule allows us to exercise our discretion to correct errors not raised before the trial court. For us to find plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. Generally, to satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, i.e., that it affected the outcome of the proceeding. If all three of these conditions are met, we may then exercise our discretion to correct a forfeited error only if the error meets a fourth criterion: the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. This rule is used sparingly, however, and is limited to those circumstances in which a miscarriage of justice would otherwise result.

*State v. Euliano*, 161 N.H. 601, 605 (2011) (quotation and citations omitted).

## 1. Hearsay

The defendant asserts that the court erroneously admitted hearsay in the form of statements by Sergeant Lamb that: (1) the victim told him she recognized the defendant's handwriting on the letters; (2) prison officials confirmed the release of a Lebanese man named Nusret; (3) Nusret told him that he knew the defendant from time they spent in jail together; and (4) the victim told him she did not know Nusret.

█The State argues that Sergeant Lamb's testimony that the victim told him she did not know Nusret is merely duplicative of her own testimony to that effect. The same is true of Sergeant Lamb's testimony about her recognition of the defendant's handwriting.

> An allegedly wrongful admission of hearsay testimony does not constitute plain error if such testimony is merely cumulative to other evidence properly admitted. A defendant is not prejudiced by hearsay testimony that is merely cumulative of evidence already before the trial court, especially if that evidence was presented by another witness who was subject to cross-examination.

*State v. Garth*, 352 S.W.3d 644, 656-57 (Mo. Ct. App. 2011) (citation omitted). We find no plain error with respect to that testimony.

█The State argues that the other challenged "testimony about Nusret, which was minor circumstantial evidence tending to show that the defendant wrote the letters, was inconsequential." We agree. The significance of the testimony about Nusret's actual existence was minimal, particularly because the State was not required to prove the truth of the assertions made in the letters. To the extent the State relied upon the testimony to show that the defendant wrote the letters, by reflecting knowledge that allegedly only the defendant would have possessed, it was inconsequential in light of all the other evidence pointing to him as the author of the letters, including his handwriting and fingerprints. Because the defendant has not demonstrated that the alleged error affected the outcome of the proceeding, we do not find plain error. *See Euliano*, 161 N.H. at 605.

## 2. Fingerprint Evidence

The defendant next challenges the fingerprint evidence on the ground that the State failed to establish a foundation for the fingerprint cards allegedly bearing known prints of the defendant. At trial, Sergeant Lamb was asked to explain how the "procedure work[s]" for having "something transferred to the lab for fingerprinting." After describing the general

procedure, he stated that in this case, he completed an evidence examination request form in which he "asked for comparison prints to a known suspect, [the defendant]."

The State's fingerprint examination expert testified that she performed a fingerprint analysis on each of the three letters. She was asked if she had "a sample of the defendant's fingerprints in this case to compare the [latent fingerprints on the letters] to," and she replied, "Yes. I had a known recording of them." Specifically, she testified that she had two cards. The first bore the defendant's name and an address of "8 Lawrence Road, Salem, New Hampshire." The second bore an address of "Route 28, Manor Motel, Room 226." She confirmed that the prints on both cards were of the same person. The jury heard the victim testify that she lived at 8 Lawrence Road, Salem, New Hampshire.

The defendant notes that the State failed to introduce testimony from the person who took the prints purporting to be his on the cards and "introduced nothing about a system of collecting and maintaining fingerprint records." He argues:

> Insofar as the card was prepared out-of-court, the link asserted on the card between [himself] and the fingerprint amounted to hearsay. In order to justify the admission of that out-of-court statement, the State had to introduce a foundation sufficient to bring the hearsay within some exception.

(Citation omitted.) Noting that a foundation for fingerprint cards is often laid using the business records exception, *see State v. Howe*, 159 N.H. 366, 373 (2009), he contends that the State failed to lay such a foundation here. He then cites a number of out-of-state cases finding error in the admission of unauthenticated fingerprint cards. *See Louis v. State*, 647 So. 2d 324 (Fla. Dist. Ct. App. 1994); *State v. Rich*, 359 S.E.2d 281 (S.C. 1987); *cf. State v. Foster*, 200 S.E.2d 782, 793 (N.C. 1973) (although card not introduced, court noted in dicta that its admission would have been error).

These cases, as well as *Howe*, are inapposite, however, because the State never sought to introduce the fingerprint cards purporting to bear the defendant's fingerprints. The defendant's challenge, then, is not to the admissibility of the cards themselves, but to the admission of the fingerprint expert's testimony. Thus, he argues: "In the absence of a foundation adequate to link the known fingerprint on the cards to [him], the experts' testimony purporting to identify [him] as the source of the latent prints found on the letters should not have been admitted."

A more analogous case, then, is the Georgia Supreme Court's decision in *Roebuck v. State*, 586 S.E.2d 651 (Ga. 2003):

Appellant contends that the print card is hearsay, because it was never formally tendered and admitted as a business record. However, the testimony of the expert is what connects Appellant to the crime, and admissibility of that inculpatory testimony does not depend upon the admission of the print used by the witness to compare with the one taken at the murder scene. Even if the failure to proffer the print card as a business record renders it hearsay, the rule in this state is that an expert may base his opinion on hearsay. The presence of hearsay does not mandate the exclusion of the testimony; rather, the weight given the testimony is a question for the jury.

*Roebuck*, 586 S.E.2d at 655 (quotation, citations, brackets and ellipsis omitted). Similarly, the court in *In re D.Y.*, 34 A.3d 177 (Pa. Super. Ct. 2011), concluded that the trial court did not err in admitting the opinion testimony of a fingerprint technician linking latent fingerprints from the crime scene to the appellant:

In this particular case, Technician Parson compared latent fingerprints taken from the scene of the burglary at Ms. Francis' home with a "ten print card" on file with the Philadelphia Police Department, and determined that the fingerprints taken from Ms. Francis' home belonged to Appellant. The only issue is whether the trial court abused its discretion in permitting Technician Parson to testify to an alleged hearsay statement — *i.e.* that Appellant's name and fingerprints were on the ten print card. We find that because Technician Parson was an expert and relied upon the hearsay statement to form his opinion, he was properly permitted to testify to the hearsay statement under [Pennsylvania Rule of Evidence] 703 and 705.

*In re D.Y.*, 34 A.3d at 182. We note that New Hampshire Rule of Evidence 703 is identical to Pennsylvania Rule of Evidence 703, and provides, in part, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [upon which the expert's opinion or inference is based] need not be admissible in evidence." N.H. R. Ev. 703. We also note that the defendant does not raise a Confrontation Clause issue. *Cf. Williams v. Illinois*, No. 10-8505, 2012 WL 2202981, at * 6 (U.S. June 18, 2012) (plurality opinion) (concluding that "[o]ut of court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause").

 We need not go as far as *Roebuck* and *In re D.Y,* however. Because our review on this issue is for plain error, it is not necessary for us to determine whether there was actual error where the defendant has not met any of the remaining prongs of the plain error analysis. First, even assuming, without deciding, that it was error to admit the fingerprint examination expert's testimony without a more thorough foundation, the error is not plain. "For the purposes of the plain error rule, an error is plain if it was or should have been obvious in the sense that the governing law was clearly settled to the contrary." *State v. Ortiz,* 162 N.H. 585, 591 (2011) (quotation omitted). "The trial court's error in this matter could not have been 'clear' or 'unequivocally obvious' because this case presents an issue of first impression." *Id.* We have not been asked previously to decide whether Rule 703 permits admission of expert testimony linking latent fingerprints with ostensibly "known" prints without an adequate foundation linking the "known" prints to the defendant. Accordingly, the error, if any, is not plain.

Moreover, the defendant has not demonstrated either that the error affected substantial rights, "*i.e.,* that it affected the outcome of the proceeding," or "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Euliano,* 161 N.H. at 605. The defendant has not argued that the print cards are not in fact genuine; *i.e.,* that the prints on the cards are not his. *Cf. United States v. Shields,* 573 F.2d 18, 20, 22 (10th Cir. 1978) (finding no plain error affecting substantial rights in admission of handwriting analysis expert's testimony, although "none of the documents used for comparison purposes were identified at trial, admitted in evidence or found by the trial court to contain the [defendant's] genuine signature," where "[n]o actual challenge was made to the genuineness of the handwriting comparisons testified to by" the expert). Moreover, the State asserts that the cards' authenticity was supported by circumstantial evidence, specifically, the presence of the defendant's name and address on the cards, and cites *Thomas v. State,* 824 So. 2d 1 (Ala. Crim. App. 1999), *overruled on other grounds by Ex parte Carter,* 889 So. 2d 528, 533 (Ala. 2004), as rejecting "a similar claim of plain error" where, *inter alia,* the card contained the defendant's name, date of birth, social security number, height, eye color, sex and race. *Thomas,* 824 So. 2d at 15, 64. The *Thomas* court concluded that "[a]lthough the prosecution should have laid a proper foundation for the card, by other information, the record presents ample circumstantial evidence from which one could reasonably conclude that the fingerprints on [the card] were those of [the defendant]." *Id.* at 64. Although the challenge raised here was to the admission of hearsay rather than a lack of authentication, *Thomas* presents sufficient factual similarity to inform our decision.

■ We emphasize that "[a] timely objection in the trial court as to the foundation of technical evidence is necessary to give the State the opportunity to correct any deficiency in the proof." *People v. Sparks*, 780 N.E.2d 781, 784 (Ill. App. Ct. 2002). In this case, where the genuineness of the cards was not challenged and their authenticity was supported by circumstantial evidence, and where other evidence identifying the defendant as the letters' author was admitted at trial, including recognition of his handwriting and the similarity of threats in the letters to prior threats made by him, we conclude that the defendant has not demonstrated error affecting his substantial rights. *See United States v. Ward*, 182 Fed. Appx. 779, 793 (10th Cir. 2006).

## C. Comments on Evidence

The defendant next argues that the trial court committed plain error in commenting on the evidence. Specifically, he argues that in the presence of the jury, "the court described [the victim] as having testified that [the defendant] physically abused her during their marriage," and, in doing so, "endorsed the most incriminating and damaging interpretation of [her] ambiguous testimony on that point."

At trial, the defendant cross-examined the victim about her fear of him, asking, "What I did to you in my life?" and, specifically, "Did I push you? Did I punch you? Did I threaten you?" The State objected and the victim did not respond. After a break in the proceedings, the victim testified that the defendant was "intimidating" throughout their marriage and "threatening" once she decided to leave. Specifically, she testified that he threatened to "kill [her] and send [her] dead in a box before Christmas to [her] family."

During redirect, the State asked:

Q. Now the defendant asked you if he ever hurt you, threatened you, things of that nature. Did the defendant ever hurt you?

A. He used to — he was violent in a way — he did not consider himself violent.

Q: Now you said that he was violent. What would he do?

THE COURT: Well, let me stop. Let me just remind the State too that we're trying here, the three letters and whether or not there's a basis for her feeling threatened. Her testimony is, as yet unchanged, that she had a good faith basis for feeling threatened.

[THE STATE]: I understand that but just for the record, Judge, he opened the door when he asked her if he was violent towards her, pushed her, hit her, anything of that nature which is

—

THE COURT: And her answer to the general question is yes. I don't think we need to know the details.

The defendant asserts that in her cross-examination testimony, the victim "unequivocally alleged verbal threats, but . . . did not clearly allege physical violence," and that her testimony, therefore, "reflects at least some ambiguity as to the issue of physical abuse." He then argues that the court erroneously "endorsed the most incriminating interpretation of [the victim's] testimony" by "saying that . . . [she] did allege physical violence." We disagree.

 "[A] trial judge is not prohibited from summarizing the evidence, so long as he does not manifest bias in the presentation of evidence." *Euliano*, 161 N.H. at 607 (quotation and brackets omitted). The court stated that the victim's "answer to the *general* question is yes" and that there was no need to inquire into the details. (Emphasis added.) Given the immediately preceding reference by the State to the defendant's inquiring of the victim whether "he was violent towards her, pushed her, hit her, anything of that nature," we interpret the "general question" to mean whether he was violent and the "details" to refer to whether he pushed or hit her. Because the victim testified that the defendant "was violent in a way," the court's comment on the evidence was not inaccurate. The remainder of the court's statement advised the State that whether the violence involved physical abuse, such as pushing or hitting, was irrelevant. We fail to see how these comments prejudiced the defendant, and, therefore, "we are not persuaded that [they] give rise to plain error affecting the defendant's substantial rights." *Id.* at 606.

### D. Sentencing

Having rejected the defendant's first two claims of error, we affirm his conviction. We now turn to the defendant's challenges to his sentence.

### 1. Request for Counsel

The defendant argues that the trial court erred in denying his request for counsel at sentencing. In a motion dated May 12, 2009, the defendant alleged that he "had filed and sen[t] a Financial Affidavit for appoint[ment] of counsel to represent[] [him] at the sentence hearing" and asked the court to "[a]ppoint[] counsel[] to represent[] [him] in this matter." The State objected at the sentencing hearing on May 27, arguing that the defendant had waived his right to counsel at trial "and this is obviously a continuation of the trial proceeding." The court stated from the bench that during the nearly five years the defendant had been involved with the criminal justice system, he had been represented by several lawyers, including Attorney Reardon and Attorney Joe Malfitani:

Joe Malfitani, who's one of the top five criminal lawyers in this state and has been for many years, has represented him. Neil Reardon has also been a 25-year lawyer, dealing exclusively in criminal matters, has represented him. And in both of those instances, he was unable to communicate and work with those lawyers. It would be highly unlikely that any other lawyer that I might appoint for him would have any more success tha[n] those seasoned criminal lawyers have had in the past, and that's why I'm not appointing a lawyer for him with respect to the issue of sentencing.

In a written order issued following the sentencing hearing, the court named six "experienced criminal lawyers" who had represented the defendant since the indictments were handed down, and added, "Again, it is worth repeating that the fact that the defendant did not have counsel was due exclusively to his inability to work with a series of lawyers appointed for him in the past."

 On appeal, the defendant challenges the denial of appointed counsel at sentencing under the State and Federal Constitutions. Because "the defendant failed to raise a state constitutional claim in the trial court," however, "we . . . confine our constitutional analysis to the requirements of the Federal Constitution." *Euliano*, 161 N.H. at 608. We review the court's decision for an unsustainable exercise of discretion. *See, e.g., United States v. Irorere*, 228 F.3d 816, 827 (7th Cir. 2000); *cf. Lambert*, 147 N.H. at 296 (explaining unsustainable exercise of discretion standard).

Though the right to counsel was originally a trial right, the Supreme Court has extended the right to various "critical" stages of the prosecution and has held that sentencing is one such "critical" stage. Thus, whenever a defendant is denied counsel during sentencing, the Supreme Court has uniformly found constitutional error without any showing of prejudice.

*Robinson v. Ignacio*, 360 F.3d 1044, 1056 (9th Cir. 2004) (citations omitted). That the defendant has previously waived his right to counsel at trial does not justify a denial of counsel at sentencing. *See id.* at 1058-59. Thus, several federal circuits have concluded:

[A] defendant who has waived his right to counsel may nonetheless re-assert that right for the purposes of a sentencing proceeding and cannot be denied on the grounds that the defendant has previously waived that right. Instead, the trial court must have a sufficient reason if that request is to be denied.

*Id.* at 1059.

The reason given here was the defendant's inability to work with his attorneys in the past. Other courts have upheld that reason as sufficient to justify denial of counsel at sentencing. For instance, the court in *Irorere* found no error where the trial "court found that the defendant, through his own conduct, had already frustrated four attempts by the district court to provide [him] with representation and had thereby waived his right to counsel." *Irorere*, 228 F.3d at 827. Similarly, in *United States v. Sutcliffe*, 505 F.3d 944, (9th Cir. 2007), the court held:

> Defendant was not unconstitutionally deprived of his right to counsel at sentencing . . . [where] Defendant's conduct forced several successively appointed trial attorneys to request withdrawal from representation, and the court eventually held that Defendant had implicitly waived his right to counsel. . . . Defendant was not entitled to the appointment of yet another attorney to represent him at sentencing, having already waived that right through his conduct . . . .

*Sutcliffe*, 505 F.3d at 962 (reviewing issue *de novo*).

 We find these cases persuasive. Although the mere fact of a prior waiver of counsel does not justify a denial of counsel at sentencing, the lesson of *Irorere* and *Sutcliffe* is that the trial court may look to the circumstances surrounding that waiver in determining whether the defendant has also effectively waived his right to counsel at sentencing. "Whether the defendant has waived his right to counsel is a practical determination that depends on the particular facts and circumstances of each case, including the conduct of the accused." *Irorere*, 228 F.3d at 827 (quotation and ellipsis omitted). "A defendant can waive his right to counsel through conduct as well as words," *United States v. Traeger*, 289 F.3d 461, 475 (7th Cir. 2002) — in particular, "through his own contumacious conduct." *Irorere*, 228 F.3d at 826. We conclude that a trial court making the determination here at issue is entitled to take into account that it is dealing with "a defendant who refused to cooperate with numerous appointed counsel." *United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir. 1989). The court here did not rely upon the mere fact of the prior waiver, but explicitly explained that the denial of the defendant's request for counsel "was due exclusively to his inability to work with a series of lawyers appointed for him in the past." We find no unsustainable exercise of discretion.

### 2. Felony Sentences

Finally, the defendant argues that the trial court erred by imposing felony sentences. He contends that because RSA 633:3-a, VI "authorizes

only misdemeanor sentences under the circumstances here, the court committed plain error in imposing felony sentences."

RSA 633:3-a, VI (1996), the stalking statute, provides:

> (a) Any person convicted of a violation of this section and who has one or more prior *stalking* convictions in this state or another state when the second or subsequent offense occurs within 7 years following the date of the first or prior offense shall be guilty of a class B felony.

> (b) In all other cases, any person who is convicted of a violation of this section shall be guilty of a class A misdemeanor.

(Emphasis added.) The defendant points out that his prior conviction in 2004 was for violating a protective order, and not stalking.

The defendant's indictments, however, also reference RSA 173-B:9, IV (c), dealing with violations of domestic violence protective orders, and the State contends that his felony sentences are authorized by that statute. RSA 173-B:9, IV provides in relevant part:

> Any person convicted under RSA 173-B:9, III, or who has been convicted in another jurisdiction of *violating a protective order* enforceable under the laws of this state, who, within 6 years of such conviction or the completion of the sentence imposed for such conviction, whichever is later, subsequently commits and is convicted of one or more *offenses involving abuse* may be charged with an enhanced penalty for each subsequent offense as follows:

> . . .

> (c) If the subsequent offense would otherwise constitute a class A misdemeanor, it may be charged as a class B felony . . . .

RSA 173-B:9, IV (2002) (emphasis added). "Abuse" is defined to include "[i]nterference with freedom as defined in RSA 633:1 through RSA 633:3-a." RSA 173-B:1, I(d) (2002) (amended 2010). Thus, the crime of stalking, as defined in RSA 633:3-a, constitutes abuse for purposes of RSA 173-B:9, IV.

The parties appear to agree that RSA 173-B:9, IV and RSA 633:3-a, VI, as applied to this case, ostensibly conflict, with RSA 173-B:9, IV authorizing felony sentencing and RSA 633:3-a, VI prohibiting it. The issue before us, then, is one of statutory construction.

> In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute

considered as a whole. We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme.

*State v. Kidder*, 150 N.H. 600, 602 (2004) (quotation and citations omitted). In addition, "[w]e construe provisions of the Criminal Code according to the fair import of their terms and to promote justice." *State v. Burke*, 162 N.H. 459, 461 (2011) (quotation omitted); RSA 625:3 (2007).

The defendant urges another rule of statutory construction: "When interpreting two statutes which deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute." *Sanborn Regional Sch. Dist. v. Budget Comm. of the Sanborn Regional Sch. Dist.*, 150 N.H. 241, 242 (2003) (quotation and ellipsis omitted). He also notes that we will avoid an interpretation that renders a statutory term superfluous or that leads to an absurd result. *See State v. Duran*, 158 N.H. 146, 155 (2008). He posits that RSA 173-B:9, IV can be read as not including stalking convictions under RSA 633:3-a so long as that interpretation does not "render[] RSA 173-B:1, I(d)'s reference to the stalking statute superfluous." He then asserts, "That problem does not arise here, though, because the inclusion of stalking within the definition of 'abuse' has applications outside the criminal sentencing context controlled by RSA 633:3-a, VI." He cites, for instance, RSA 173-B:2, II (2002), :4, I (2002), and :5 (Supp. 2011).

We cannot subscribe to the defendant's strained interpretation of these statutes. As the State notes, to do so would require us to read an exception into RSA 173-B:9, IV(c), so that it would apply to subsequent offenses "*except for offenses under RSA 633:3-a.*" (Quotation omitted.) We do not, however, "pick and choose those portions of the language we find controlling and subvert those we do not," and "[w]e will neither consider what the legislature might have said nor add words that it did not see fit to include." *Id.*

We instead find the following rule instructive:

It is a well-recognized rule of statutory construction that where one statute deals with a subject in general terms, and another

deals with a part of the same subject in a more detailed way, the latter will be regarded as an exception to the general enactment where the two conflict.

*Appeal of Johnson,* 161 N.H. 419, 424 (2011) (quotation omitted). The State points out that while RSA 633:3-a deals with stalking in general, RSA 173-B:9, IV(c) applies to "a much more specific subset of the general group of offen[ses] covered by RSA 633:3-a"; namely, "those offenses . . . committed 'by a family or household member or by a current or former sexual or intimate partner, where such conduct is determined to constitute a credible present threat to the petitioner's safety,' and where the defendant has previously been convicted of violating a protective order." (Quoting RSA 173-B:1, I (Supp. 2011).) The State also notes that RSA 173-B:9, IV was enacted in 1999, six years after RSA 633:3-a, IV. "When a conflict exists between two statutes, the later statute will control, especially when the later statute deals with a subject in a specific way and the earlier enactment treats that subject in a general fashion." *Petition of Public Serv. Co. of N.H.,* 130 N.H. 265, 283 (1988) (quotation omitted).

We conclude that RSA 173-B:9, IV applies in this case. We point out that we need not find an implied repeal of RSA 633:3-a, VI to reach that conclusion. *See Board of Selectmen v. Planning Bd,* 118 N.H. 150, 152-53 (1978) (noting that "implied repeal of former statutes is a disfavored doctrine in this State"). Rather, we conclude that to the extent the statutes conflict, RSA 173-B:9, IV, as the more specific statute, controls. *See Johnson,* 161 N.H. at 424. We find this conclusion further supported by RSA 173-B:9, IV's "enhanced penalty" designation. RSA 173-B:9, IV. Accordingly, the trial court did not err in imposing felony sentences, and, therefore, the defendant has failed to meet the first prong of the plain error test. *See Euliano,* 161 N.H. at 605.

*Affirmed.*

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.